The next case on the calendar is 335-7 LLC v. City of New York. May it please the court, I'm Brian Barnes for the plaintiff appellants. The court has before it several cases where plaintiffs are challenging the rent stabilization laws. And I'd like to focus on one aspect of this appeal that is unique. Unlike the other appeals before the Second Circuit, which is the confiscatory takings claim that we brought. That's not a claim that's before the court in any of the other cases. And I'd like to start by making the point about that confiscatory takings claim. That unlike some of the other claims that we've brought and other plaintiffs have brought, that's not a claim that would require the court to effectively force fundamental changes to the way rent stabilized apartments are regulated in New York City. We're not saying with this claim that the Constitution entitles us to evict tenants at the ends of their leases. And we're not saying that it entitles us to charge whatever rents we want. But what we are saying with the confiscatory takings claim is something much more modest. Which is that if the government is going to compel us to rent out apartments at a government prescribed rate, that that rate just needs to be just and reasonable. And the just and reasonable standard is a standard that is well established in Supreme Court precedent. We have over 100 years of guidance from the Supreme Court about how that standard should be applied to government rate making. And it's a standard that gives government rate makers a measure of discretion, but it also places meaningful limits on that discretion by requiring that government set rates be set either with reference to the prudently incurred costs that property owners have incurred in maintaining their property, or with some reference to the rates of return that investors expect to receive on equivalent risks and equivalent investments in the private market. We would have to decide that this doctrine, which is applied largely in the context of public utilities, is properly applied in these circumstances. And the fact that your clients are, however impaired you might think they might be, are able to exit the business. Wouldn't that be a problem for application of this doctrine, or am I misunderstanding something? Well, I guess a couple of responses on that, Your Honor. First, we think that all of the supposed off-ramps or exit options that the defendants point to are illusory. And certainly as applied to the plaintiffs, they're both economically infeasible, but perhaps more importantly, as a matter of law, they should not be treated as legitimate off-ramps. And I guess one point I'd make here is I think it's really important for the court to drill down on the specific off-ramps that the defendants point to for these purposes. And so I think in the red briefs, there's a tendency just to sort of run through these off-ramps as kind of a laundry list without really responding to the arguments that we've made about why they're illusory and not legitimate off-ramps. So let me talk about the ones that I understand the district court and the defendants to be primarily relying on. So one was this idea that, well, we could sell our property to someone else, and that's a way of getting out of this business. And the problem with that, treating that as an off-ramp, I guess first and foremost, is the Supreme Court's decision in Loretto. So in Loretto, the Supreme Court recognized that Mrs. Loretto still owned her apartment building. She still had title to it and that she could transfer that title to someone else, and the court nevertheless found a physical taking. Think also about the Supreme Court's recent decision just last term in Cedar Point. The farmers in that case could have sold their farm, but the ability to sell a piece of property that's subject to some type of taking does not count as a legitimate off-ramp for purposes of making my client's participation in this industry voluntary. And it wouldn't make sense for that to be the case either, because whoever we sold our apartments to, the acquiring party would be receiving them subject to the same regulatory regime that we'd be selling them out of. And so you're just really replicating the taking as to a new owner as opposed to defeating the taking or making my client's participation in this arrangement voluntary. Another off-ramp that the defendants and the district court pointed to is this idea that under this regulatory regime, we could tear down our buildings, pay a generous living stipend to the evicted tenants, and get out of the industry that way. The problem with that off-ramp is that it really forces us just to choose between different takings. So the government has given us a menu of options, but if you look at the specific menu of options that we've been given, every option on the menu is a taking. It would be a taking if the government sent to my clients a letter that said, we hereby order you to tear down your building. Destroying the building would be a taking. And so we can't be put to the choice of being subjected to unjust and unreasonable rates on the one hand, which is a taking under the Fifth Amendment, or destruction of our buildings, which is another taking under the Fifth Amendment. And that issue, it came up in the Coots case, which we cite in our briefs, where in that case there was a choice that the land use regulators gave to the plaintiff about which type of land use exaction the plaintiff would be subjected to. And the court said that at least one of the options that was given to the plaintiff had to be an option that didn't constitute a taking. And we haven't been given such an option here. I'm trying to understand how the proposal for a more favorable or more equitable adjustment of profit or revenue would actually work. I mean, doesn't the answer to that just vary from building to building? Some landlords who own wind stabilization may be losing money. Most have probably figured out how to make some sort of profit by running these businesses. I mean, by owning and managing these businesses. Otherwise, presumably, they wouldn't be in the business. So how would that play out? Yeah, so I think the right place to start for thinking about that question, Your Honor, is the Supreme Court's decision in In re Permian Basin, which is cited in a couple of the briefs. It's a Supreme Court case from the 1960s. And the facts of that case involved a general area where there were a lot of different natural gas producers. And the government regulator there had set rates based upon a certain degree of fine-tuning as to different types of producers and where they were located within the area. But they were general sort of across-the-board industry-wide rates. And I think the way to think about the inquiry in a situation like that or like what we have here is there are actually two permissible types of challenges under a confiscatory takings theory. So one would be to say that the rates that the government has set are facially invalid because they don't allow the industry as a whole to recover a just and reasonable return. And that's a type of claim that could be brought and that we have brought. Another type of claim that could be brought would be to say the method of setting rates that the government has adopted isn't granular enough to take into account meaningful differences between different types of apartments. And that's another type of colorable claim under this confiscatory takings doctrine. We're not necessarily taking the position that rates have to be set on a building-by-building basis. But I do think it's the responsibility of the defendants under this sort of framework, consistent with Permian Basin, to take into account and basically base the rates that they set on a representative group of apartments that are subject to this regulatory regime. One other thing I would note on your question, Judge Parker, is that it's true that my clients and everyone who owns an apartment in this space, or virtually everyone, bought into this legal regime, but it was before the 2019 amendments to the regime. And that's super important from the standpoint of the confiscatory takings claim because even though the rates themselves, in terms of annual increases that the board would authorize, were less than what was necessary for typical building owners to recover their costs, there were these other mechanisms by which the owner of a property could ultimately receive what would amount to, on an all-in basis, a just and reasonable return. So there were these vacancy increases that could be taken when a unit became vacant. There was the opportunity, a meaningful opportunity, to actually do condo conversions and a host of other mechanisms by which, even if the year-to-year rent that the board was authorizing us to charge wasn't enough to cover our costs, in the long run we could recover costs. And that's no longer the case. The only sort of source of revenue or income associated with these apartments now is the rates that the board sets year-to-year, and those rates are insufficient. In many of the cases of the specific apartments my client owns, those rates are insufficient to cover their costs. Let me ask you, this is, in some, I preface it by saying this is kind of an out-of-the-box question because, as you might have gathered, I've been thinking about these issues for a number of weeks now. Is there any city in the world that has gotten this problem right that you would emulate, that you would point to? You know, Your Honor, I confess that I don't know the answer to that question. I'm just not an expert on- You know, all the European cities wrestle with this. South American cities have it. Yeah, and I guess- Don't spin any more. Well, let me make one point, if I could, that I think is at least adjacent to the question Your Honor is asking, which is that the complaint in this case, if you look at paragraphs 196 to 210, we discuss sort of the economic implications of the regulatory regime that we're challenging here. And, you know, I think one of the very few things that both conservative and progressive economists agree about is that- They don't like this. Nobody. Nobody likes this because it reduces both the quality and the quantity of affordable housing in New York City. And, I mean, that is something that we've alleged in this complaint. And so, at least for purposes of this appeal, the court has to accept it as true. But more fundamentally, it is true. And, you know, for that reason, you know, I'm not sure what the perfect regulatory regime looks like. And we're not asking the court to order some sort of massive overhaul of the regulatory regime. If the market were unregulated, where would poor people live? Well, if the market were unregulated- And how long would they have to wait for these houses? So, just so I understand the court's hypothetical, if the market were- Tomorrow, let's say this is entirely hypothetically, all of this entire regime gets thrown out. Unconstitutional. Where would poor people live? So, I think, actually, both the quantity and the quality of affordable housing in New York City would increase. How? Well, because landlords would be given an incentive to invest in properties that were affordable. And they wouldn't be trapped in these economic relationships where they're not in a position to be able to economically renovate properties and invest in them. Why would I build a house for poor people as opposed to building a house for, you know, lawyers? Well, I think the city of New York is large enough for both kinds of houses. Where? New York seems pretty full up. It may be full up, Your Honor, but I nevertheless think that an unregulated market would increase the supply, at least as compared to a market that has a price ceiling. I mean, that's just basic economics. It might be a difficult transition period. Well, and the transition would not be difficult on our confiscatory takings theory. I want to emphasize that under that theory, it would just be a matter of the board setting rates that are just and reasonable. That's all we're asking for with respect to that confiscatory takings theory. I'm trying to figure out how that theory adds anything. It strikes me that the regulatory takings framework is a framework that would address regulations that led to confiscatory circumstances where there weren't just and reasonable rates of return. And that the place to make the economic arguments that you're making about that are within the context of the already existing framework that can accommodate that rather than extend it. I'm just trying to figure out why we need a new thing. Yeah, so the confiscatory takings framework is, I mean, it's under current Supreme Court precedent. It is a body of takings law. And it both predates the development of the regulatory takings doctrine, so it goes back to the 19th century. And it's a set of precedents that has continued on even as the Supreme Court developed the Penn Central test. So if the court looks at the Duquesne decision, which is a Supreme Court decision decided long after Penn Central. So it's clear that this is a viable area of takings precedent. And there are different ways of thinking about the confiscatory takings doctrine. But one way, perhaps, of thinking about it is it's kind of a specific instantiation of when a regulatory taking should be found. And I guess the point I'd make about confiscatory takings and why perhaps the Supreme Court has treated those takings differently than just the general regulatory taking standard that we see under Penn Central is because property owners who are subjected to price regulation of this sort and who have invested in immovable assets, made large capital investments in immovable assets, they're particularly vulnerable to government regulation in the price setting context. And so that may be part of the reason that the Supreme Court is telling us to pay particular attention to this type of regulation and apply a different legal standard. But I guess the main point I want to make is it's Supreme Court precedent, and I think it applies here. I guess I'm just trying to figure out how different the legal standard really is. Is it your view that the regulatory takings doctrine countenances a regime in which the rates that landlords are entitled to recover aren't just unreasonable? Yeah, I think it depends on how the court conceives of the proper application of Penn Central. So my friends on the other side say, well, there are cases where someone suffers a 90% diminishment in the value of their property and there's no taking. And so as a matter of law, I think the district court said, you know, the 35% or so diminishment that we sustained is insufficient. That would clearly be wrong under the Supreme Court's confiscatory takings cases. I don't think that's even a correct application of Penn Central. But to the extent that the court goes down the path of treating Penn Central as a very kind of watered down, loose thing that doesn't provide meaningful protection to property owners, then I think the confiscatory takings framework provides a much more robust protection. Does it have the more, the focus of the doctrine has a more ongoing attention to the price regulation and its reasonableness than the other cases? At least that was my initial observation. That's absolutely right, Your Honor. I think that this line of precedence calls for a more rigorous focus on the reasonableness of the rates that are set by the government than what we would maybe typically otherwise see, at least in the application of Penn Central by a lot of courts. Thank you. Thank you. May it please the court, Esther Murduqueva for Commissioner Visnauskas. I'd like to thank counsel for the city and interveners for each seating a minute of their time. Appellant's takings challenges are foreclosed by well-settled precedent holding that regulation of the landlord-tenant relationship is not a physical taking, that the mere decline in economic value of a property does not state a regulatory takings claim, and that confiscatory takings claim that appellants have focused much of their argument about today is simply not cognizable in the land use regulation context. These cases arise in the public utilities context. The term just and reasonable rates is a term of art that derives from case law that applies to the public utilities context. The argument is that the landlord-tenant relationship in this context is more similar to a public utility situation in a number of respects, that the landlords are subject to price regulation. They have limited exit options. You may disagree about that. But like a public utility, they've invested, I guess the thrust of it is they've invested in fixed assets that you just can't take up and move. Well, your honor, I think the key distinctions between what a public utility does and what landlords do are both in number and in kind. There are many fewer public utilities, and because there are fewer public utilities, they are tasked with a specific public purpose of providing services to all applicants on a non-discriminatory basis. Landlords, there are many more landlords, and landlords here have voluntarily decided to enter the residential rental market. Yee, and this court's subsequent precedents applying yee in the physical takings contest, have been very clear that when a landlord voluntarily offers housing to third-party tenants, the mere regulation of that relationship does not constitute a physical taking, and it similarly does not constitute the kind of compulsion that you would have in the public utilities space. Now, there is a reason why courts have traditionally looked at these types of challenges through the physical and the regulatory takings framework, and that is because those are the frameworks that are keyed to the type of land-use regulations that are at issue here. If I may turn to the physical takings claim, as I mentioned, yee and this court's precedents have uniformly held that this type of regulation is not a physical taking. I would like to stress that regardless of appellant's characterization of the exit ramps, it is notable that none of the appellants alleges that they actually want to exit the residential rental market. What the appellants want is the ability to continue to rent their apartments to tenants, but at higher rents, or to engage in other types of practices that the RSL restricts. But there is no constitutional right to participate in the rental market free from regulation, and that includes regulation of collectible rents and the terms of tenancies. The law on its face provides numerous exit ramps from the rental market. They're stated in our brief, and I won't belabor them here. The availability of those exit ramps on the face of the law under yee forecloses the facial challenges, and the as-applied challenges are either largely restatements of the facial challenges, or fail because they do not allege that any of the appellants here actually wishes to exercise those exit ramps and has been forced off from being able to do so. If I may turn to the regulatory takings claim next. Setting aside the ripeness issues with respect to the regulatory takings claims that the district court correctly identified, the claims also fail on the merits. Landlords who have entered the residential rental market in New York City are well aware of the rent stabilization law. Some form of it has existed for decades. In fact, there are numerous landlords who accept the restrictions of the RSL in exchange for valuable tax benefits or other public funding. It cannot be said on a facial matter that all of those landlords have the same types of expectations of a static version of rent regulation or, in fact, of no rent regulation at all. That simply would not be a reasonable expectation. Now, the appellants have argued that certain of the 2019 amendments have altered those reasonable expectations. I would wager that that is simply a misunderstanding of what the case law is about reasonable investment-backed expectations. The 2019 amendments are simply alterations of the RSL's general provisions. The RSL has changed many times over the years. In this instance, the 2019 amendments largely restored the RSL to a version that existed prior to amendments made in the 1990s. I think it would be hard for any landlord to argue that it is reasonable to expect that a statute like this would stay the same or that it is unreasonable for the legislature to decide to return to an earlier version of the statute that had existed for decades. With respect to the economic harm that the appellants identify, again, for a facial regulatory takings claim, economic harm asserted by averages or by other reference to generalized statistics, those types of allegations are simply not enough to state a facial claim. The economic value of property depends on many different factors, such as type of building, the neighborhood, the amount of effort that the landlord has put into maintaining the building. Again, those sorts of issues simply cannot be decided as a facial matter. And with respect to the as-applied claims, these claims really are all about declines in economic value. And the declines are within ranges that this Court has categorically said are not sufficient to state regulatory takings claims. I think appellants acknowledge that and they say, well, it's a decline in economic value paired with a physical taking. But for the reasons we've discussed, there is no physical taking. So really what we're looking at are complaints about the inability to charge higher rents or the inability to get a return on investments as quickly as they might have gotten such a return during other versions of the law. Those are simply not cognizable regulatory takings claims either. And with respect to the character of the government action, again, those are simply restatements of their arguments about physical takings claim and fail for the same reasons. Unless the Court has any further questions, I'll cede my time to my colleagues. Thank you. Good morning, Your Honors. Jesse Townsend for the City Appellees. Your Honors, the Rent Stabilization Law has been in place in New York City since 1969. It protects tenants from unreasonable rent increases, enables them to put down roots, and therefore fosters neighborhood stability throughout the city. Today, some two million city residents benefit from this law. And this Court has consistently and rightly rejected every challenge trying to label these laws as a taking. This Court should do the same here. Despite appellants rebranding as a confiscatory taking, the results should be the same. This Court should affirm the district court's decision. The system's been around a long time, but each time there's a change, it becomes a slightly different system. At some point, do you concede that it could become a regulatory taking if it crossed some threshold, even though the changes are incremental and most of the pieces were already in place? Theoretically, Your Honor, yes. Someone, Judge Robinson, someone could allege that a particular combination of changes as applied to their particular building has created regulatory taking. That's not what plaintiff has done here or plaintiffs have done here. None of the as applied regulatory taking claims alleged are sufficient. So for several of the individual plaintiffs, for example, they don't allege any investment back expectations. And so even conceding that it's potentially possible to allege an as applied regulatory taking challenge, these plaintiffs haven't met it. The plaintiffs, of course, on appeal focus on the confiscatory taking claim. And as previously noted, this has only ever been applied in a public utility context. And as counsel for the State argued, that context can't be translated to this context because, in fact, landlords do have exit options for the face of the statute. Among other things, they can change the use of their property any time it is vacated and put it to any other lawful use that may exist depending on other law and economic reality, et cetera. Even though if we take this confiscatory taking argument seriously and consider whether to apply it for the first time ever in a landlord-tenant relationship, I would note that what plaintiffs are still seeking, despite the change in label, is the exact same relief. Because their pled relief on sought relief on pages 117 and 118 of the appendix simply state that what they're seeking is a declaration that the RSL in its entirety affects an unlawful confiscatory taking of private property. And then the next page, that it be enjoined. So in their entirety. So they are still coming and asking for the same relief. That is to say, they are still asking for the RSL to go away, to not be enforced. Meaning that landlords have unlimited ability to terminate leases or to not renew after half a century of that being regulated and stabilized to allow that neighborhood stability. And similarly, allowing landlords to set their rates however they choose. The other thing I would just note, Your Honor. So you're making the point that they're not saying we are serving the public, we want to serve the public in the future in a non-discriminatory way and subject to just and reasonable rates, which is the sort of consideration that makes public utilities distinctive in this context. I think that's right, Your Honor. And I would also add, Your Honor, the relief plan is not, for example, the Rent Guidelines Board 2019 annual rent increase was insufficient under that standard. Or the 2018 was. And therefore, those particular orders should be annulled. It's, again, for the entire RSL to go away. The reality is the RGB, my client below, it does look at the conditions of the real estate industry as well as the cost of living and other indicia to come up with not a rent because the RGB does not set rent, but it does set a permissible rent increase every year. So it is factoring in what the real estate industry needs and what the experiences of the real estate industry are. So this is part of the system that's at issue here. Unless Your Honors have further questions of the confiscatory taking point, I would just note, again, 2 million people in the city live in rent-stabilized housing. We are a city of renters and a plurality of renters live in rent-stabilized units. So this is vitally important to the city. And we'd ask that the court affirm. Thank you. Thank you, Your Honors. May it please the court, Michael Duke from Slendigay Ellsberg, along with co-counsel from the Legal Aid Society on behalf of Intervenor Appellees. I'd like to make just two brief points, Your Honor. First, with respect to the confiscatory takings claim that my colleague on the other side focused on today, Dinkins rejected a facial claim in which the assertion was that landlords could not obtain a just and reasonable return. That's footnote 3 of Dinkins. This claim has already been rejected on a facial basis. If we look at the as-applied claims, as the district court properly noted, they are sparse. We don't have any net gain or loss. We don't have any information on the date of purchase. We don't know what the investments that these plaintiffs made, much less what their reasonable investment-backed expectations were. And in any event, Your Honors, there is a hardship exemption. If some landlord truly cannot obtain an adequate return, they can apply for one of two different hardship applications. So this confiscatory taking claim, one, has already been rejected, and two, it's baseless as applied to these plaintiffs. Second, Your Honor, I want to address the impact of this law. We heard my colleague from the other side discuss the economic impact. I want to discuss the people impact. There are 2.5 million people in rent-stabilized units in New York City. 86% of them are low, moderate, or middle-income individuals. They've been protected by the rent-stabilization laws for nearly half a century. These are parents, grandparents, children, workers, the people who make New York City what it is. And overnight, they would be stripped of the protections that have allowed them to live in our society. Unless the panel has further questions, I'll rest on my brace. Thank you. Just a couple of quick points on rebuttal, if I may. So first, we just heard reference to the Dinkins case. That's a case that went off on standing. It doesn't foreclose the merits of the legal theories that we're pressing here. I'd also note, in Dinkins, the focus of the challenge was on procedural problems with application for a hardship exception, which is a more sort of individualized and granular issue than the focus of our confiscatory takings claim, which is focused on the rates that the board sets and their rates that are set across the board. But the rates are the thing that is subject to the hardship exemption, right? That's different from the exit ramps. So how can you make, how can you complain of the rates when none of your clients, none of the clients have actually sought a hardship exemption and been denied and had an opportunity to demonstrate, here's why this isn't a reasonable rate of return for us? So we know from Pachtel and Williamson County as well that there's not an obligation on my client's part to exhaust administrative remedies before suing under Section 1983 in federal court. And the right way to think about that hardship exception is it's functionally operating as the equivalent of an administrative appeal  And one thing I would note, just factually, is that the rates that the board sets in terms of annual increases, those are the rates that prevail for well over 99% of apartments that are regulated here. Pachtel tells us we're looking for de facto finality, de facto finality. And to say that there's no final decision except with respect to somewhere between zero and five apartment buildings that are regulated under this regulatory regime every year, I think is to really stretch that concept of de facto finality beyond its breaking point. There was also reference by my friends on the other side to the relief we seek in the complaint. Here's the way I think the court should regard the remedy for purposes of the confiscatory takings theory. I think the right remedy would be an injunction against the enforcement of these rates until the defendants either set just and reasonable rates or pay just compensation. And the ability to pay just compensation is really important because the government, under the Fifth Amendment, generally the Fifth Amendment doesn't restrict the government's ability to take property. It just requires the payment of just compensation. And if the board determined, if the defendants determined that they didn't want to set just and reasonable rates for my clients, that would be within their ability to do as long as the government pays. I don't understand how this could be done other than on an apartment-by-apartment basis, one after another after another. So again... I've got new, I put in new rugs, I put in new washing machines, whatever. I painted my building and they do. Right. And that very argument was raised by the plaintiffs in the N. Ray Permian Basin case. And what the Supreme Court said is that it's permissible in the context of a rate setting where you're setting rates for a bunch of participants across an industry, it's permissible to basically pick out some representative examples and look at the costs and the rate of return for those representative examples and set industry-wide rates on that basis. But so much of what makes housing desirable or undesirable is subjective. I commute to Manhattan, so I want to be near the 4-5. I have young children, I want to be near the park. I like the views, I like the color of my hallways, and on and on and on. Right. And those subjective valuations I don't think necessarily come into play when we're doing this just and reasonable rate making. I think the thing that's really critical is to look at the actual out-of-pocket costs. And again, I think this is something that could be done... Who's out-of-pocket? Those of the landlord. The costs that the investor incurs in creating and maintaining the housing. Those reasonably incurred costs are kind of one of the critical inputs to this analysis. And again, the Inway Permian Basin case is a Supreme Court precedent that shows that it is possible to set rates on an industry-wide basis so long as there is at least some degree of tailoring to take into account differences among different types of participants in the market. With that, unless the court has further questions, I'll just urge a reversal. Thank you all. Yes, thank you all. We'll take it under advisement.